Okay, the next argued case this morning is number 13, 1358 in Re Aoki. Mr. Signard. Good morning, your honors, and may it please the court, Jonathan Signard for Appellants Aoki with my colleague Craig Countryman. The board erred in its obvious analysis on the invention and issue by applying too rigid a standard for teaching away and combining two pieces of prior art. You know, of course, that we're not supposed to be rigid. That's correct, and the board standard for teaching away. But there were pretty good references here. The board reference involves treating blepharospasm with complex botulinum toxin and say discloses uncomplexed and inhibits the release of acetylcholine. Why are these obviously put together to arrive at the invention? And that's what the board did, and I think that conflates, in terms of motivation to combine, it conflates the biologic activity, which is certainly a factor in the utility of any medicinal drug, with actual practical human utility. And if you look, your honor, at the time of the invention, it's not as if Say stood alone in the art with respect to information about the uncomplexed toxin. And there was an authoritative source, effectively a treatise, if you will. It was a review article by Dr. Shantz, who was the authoritative source in this field. And this court's authorities have often said that one needs to look at, when you're combining, you need to look at all the prior art, and you will often not see in the signature references relied on either by a challenger in litigation or the board. You won't see the basic teachings about a particular piece of art, because they're basic teachings. And those basic teachings, in this case, are found right at the time of the invention in Dr. Shantz's review article. And he variously describes it. We've gone through that. But Shantz, didn't your own declaration say Shantz was wrong? Shantz was wrong in consideration, with respect to enablement, in consideration of two articles. So it didn't lead away? Well, no, that's not, I don't think that's quite correct. We said Shantz is wrong, not was. And I don't want to argue about past tenses. That's a long time ago. But the, what Dr. Smith was talking about in this declaration was Shantz would be recognized as wrong in consideration of later information from 1994 to two articles cited by Dr. Smith in that context. And he relied on all four articles in there. And so I think what we have is a combination of references, as I said, that the most authoritative source that there was, and Dr. Shantz was and is a giant in the field. He essentially invented the use of not compatible with and unlikely to lead to human use. Surely, even Shantz says with careful treatment, the problems could be avoided. I don't think that's correct. The solicitor in the brief argued that essentially, I think, Shantz says that lamina, and that you're talking about, Your Honor, the buffered solution at pH 6.2 and 6.7 in lamina, which was used on dogs. And Shantz specifically references that low pH solution and says it's not compatible with human use. And that is at A2482. And it says experience with the toxin has proved that stability of toxicity is dependent on low pH. That's what the board's talking about and that's what the director is talking about in their brief. But such low pHs are not compatible with injections into muscle tissue. And that's how one treats blepharospasm. It's injected into the lower and upper eyelids to paralyze the eyelids sufficiently so that they no longer have the spasm. So as I said, I think what the board has done is conflate one aspect that, and no one's going to argue that its efficacy in dogs and rats is not relevant to a motivation to combine, but it exalts it to the be-all and end-all of the inquiry. And surely, a drug for use in human medical applications, this court has said, the inquiry into obviousness must be searching. And when you have a contemporaneous, if you will, treatise or review reference at the time of the invention says that despite that this is not practical with, not compatible, and unlikely, it's my trio of words that Shantz used to describe it, that surely overcomes the simple combination of using just the un-complex toxin. The board did not point to any third reference that contradicted Shantz or contradicted what Dr. Smith had to say, and therefore we think the finding on both motivations combined there is something with you. Absolutely. You don't dispute here, and you didn't dispute before the board, that as of the priority date it was, and here I'm going to quote from Dr. Smith, it was known that neurotoxic component formulation, made by the same techniques as you made the complex one, can have superior clinical effectiveness as compared to the clinical effectiveness of the complex. Can have superior clinical... I'm reading from the bottom of 9.13 to the top of 9.14. I was struck when I was reading the board that the argument, that the discussion was entirely about teaching away, and I wondered, well where is the finding about affirmative motivation to maybe think about the un-complex form? And then I read this from Dr. Smith, which suggested, okay, there's a motivation, there was a possible superior clinical effectiveness, and so what the entire debate was about, just tell me if this is wrong, was whether essentially other stuff taught away from the possibility of superior clinical effectiveness. That's actually talking about the good-no PhD thesis. Yes. Is what that is talking about, which is dated from 1994 in the context of enablement. I don't think I care what the statement that says it was known at the time that the un-complex form could have or can have superior clinical effectiveness as compared to the clinical effectiveness. Your Honor, I would say it was known at the time of that PhD thesis in the context in considering with the disclosure in the invention. I mean, the context of Dr. Smith's first declaration, right, is the difference between, can someone recognize from the prior art whether something would work or could work, the question on obviousness, and then the question is on enablement, which Dr. Smith is addressing, given the instruction in the patent to do this, to use the neurotoxin for clinical applications, is it recognized in the art, either an application or at the time, that it can be done as said, as stated in the application. So I'm not going to dispute what Dr. Smith said. We put him forward in that context, but that is in reference to what the teachings of Dr. Goodenow with the patent application at issue teach collectively. The other, I think, the other point to make, and you know, I will say, Your Honor, that is not in the board's opinion. That's Well, I was struck by that, but then it seemed to me the reason is you didn't argue it. You took off from the premises. There was a potential benefit people recognized of using the pure form, the un-complexed form, and then your whole argument was, but a whole lot of other stuff, see, Sean, said, don't do that. Bad, bad idea. Surely there's a potential benefit from using the un-complexed form. That's the point I was discussing with Judge Lurie about the biological activity, and as I said, that's one factor in the motivation to combine analysis, but the question then becomes, can we have a drug which has biological activity, and then the other requirements which Shantz talks about, and which frankly are known to persons of skill, can it actually be practically used, right? And that's really, if someone recognizes that solution, to actually be able to use the thing that one said could not be, I think, under the authorities that's deserving of an invention and a patent. It overcomes obviousness. I will also, I just will point out, in terms on the motivation to combine, it is telling to me that in the director's brief, the, if you will, the resort to new statements in Bardic as allegedly supporting the board's opinion and the heavy reliance on the lamina solution that Judge Lurie and I talked about, which neither of which is really in the board opinion, certainly the former is not, and the latter, the lamina footnote, the lamina information is in the board's opinion, simply footnoted as a notation. I'd also like to just comment one more point before I will sit down and reserve my time for the board that Shantz does not teach away. It is hard to reconcile with the actual language of Shantz, and I just wanted to emphasize that one more time, and it's not so much that that is something that the board doesn't wrestle with, but at the end of the day, one has to look at Shantz for what it taught to a person of skill, and I will just read a couple of the quotes. You know, when the pH is raised above 7.3, the neurotoxin is liberated, which is very labile, because it's a lability, the neurotoxin is not practical for medical applications, and then it goes on and talks about the pH issue that Judge Lurie and I talked about. Experience with the toxin has proved that stability is dependent on low pH, but such low pHs are not compatible with injections into muscle tissue, and then it concludes at the end of the section, after going all through this information about the complex and un-complex toxin, it concludes, most recent information concerning the structure and pharmacology of botulinum toxin has been obtained with purified neurotoxins, but it is unlikely that these will be used in a clinical setting. Pure neurotoxins can be kept for several weeks to months in solutions in the cold, but are inactivated on dilution, formulation, and drying. And I'll reserve the remainder of my time for a moment. Thank you, Mr. Singh. Ms. Lynch? Good morning, Your Honors. May it please the Court. This is a straightforward case of a simple substitution. Berodek teached using the complex botulinum toxin to treat leprosy spasm, and Seed taught that the un-complex worked the same way and had the same effect. Aoki relies on these two kind of isolated sentences in Shantz. They talk about that it's not practical for medical applications, and it's unlikely to be used in a clinical setting. But both of those sentences are tied to Shantz's other disclosure, that careful handling of the purified toxin is important for maintenance of stability. And Shantz goes ahead and he tells a person of ordinary skill in the art how to carefully handle. He says, keep the pH at a certain level and add another protein like human serum help you. So in the reply brief, Aoki now argues that, well, you can't, a high pH is incompatible with intramuscular injections, and Shantz says that. But I think what Aoki is doing is they're confusing the pH at which you store the toxin with the pH at which you inject it. So Shantz basically teaches that you inject it after diluting it with physiological saline, and Barodic says the same thing. So you store it at a low pH to keep it stable, but right before you inject it, you can put it at a pH that's compatible. The other point is that Aoki's claims actually aren't even limited to intramuscular injection. If you look at their specification, they say preferably intramuscular, but it can also be subcutaneous. Another point I just want to, they didn't raise skepticism, but they didn't argue that before the board, so I don't think I need to address that. But if this court has no questions, I'm happy to yield my time. Okay, thank you. Mr. Singer, you have the last word. I don't think we're confusing anything about the dilution aspects of what Shantz discloses. I just heard an argument that it must be stored in the cold and then diluted with saline to inject intramuscularly or subcutaneously, and Shantz is crystal clear on that scenario. Pure neurotoxins can... What book are you reading from, please? I'm sorry, A2488. And this is, again, this is the, if you will, the conclusion of Shantz. It's right before the portion... Is this column two or column one? I'm sorry, Your Honor, I should have pointed you out. A2488, you see the tetanus toxin at the bottom right. Your Honor, if you go up two paragraphs to the paragraph beginning clinical use, do you see that? And at the end, and this is where he says it's unlikely, right? And then he talks about the exact situation we just heard of. Pure neurotoxin can be kept for several weeks to months in solution in the cold. Now we're going to administer it. We're going to dilute it with physiological saline at the preferred pH, but are inactivated on dilution, formulation, and drying. Shantz is clear that what we just heard could not be done, and the inventors, Aoki, showed that it could and deserved their patent. Any other questions? I'm happy to answer them, but thank you very much. No questions? No questions? Okay. Thank you, Mr. Singer and Ms. Lynch. The case is taken under submission. That concludes the argued cases for this morning. All rise. The Honorable Court is adjourned until tomorrow morning, 6 o'clock a.m.